IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIAN A. DAVIS,

      Plaintiff,

      v.

DEBORAH LEFF, Pardon Attorney;
JEH JOHNSON, Secretary, Department
of Homeland Security;
S. GINGERICH, JR., Senior Deputy Deportation
Officer, Department of Homeland Security,

      Defendants.

_____/

Case: 1:16–cv–00821
Assigned To : Jackson, Ketanji Brown
Assign. Date : 5/2/2016
Description: Pro Se Gen. Civ.

**COMPLAINT SEEKING INJUNCTIVE
AND DECLARATORY RELIEF**

## CIVIL COMPLAINT

Plaintiff Brian A. Davis (hereinafter "Plaintiff" unless otherwise stated), alleges the following:

### I.  GENERAL ALLEGATION

1.    This is a civil action based on violations of Plaintiff's constitutional and statutory rights as defined under the United States Constitution and federal law.  Generally, this civil action addresses violation of constitutional rights committed by the named Defendants—rights guaranteed by the First, Fifth and Eighth Amendments to the United States Constitution, and violation of the Administrative Procedure Act, 5 U.S.C. § 706 et seq.

2.    This is also a petition for injunctive relief, declaratory judgment under the Federal Declaratory Act, a writ of mandamus, and injunctive relief under the Administrative Procedure Act,



RECEIVED
FEB 2 9 2016
Clerk, U.S. District and
Bankruptcy Courts

RECEIVED
Mail Room
FEB 2 9 2016
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

5 U.S.C. § 706 et seq.

3.      The allegation set forth below addresses two distinct sets of violation: The first addresses a violation under Administrative Procedure Act; the second addresses substantive due process and equal protection violations, and deprivation of Plaintiff's liberty.  Each violation directly affects Plaintiff's constitutional rights.

## II. JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and its inherent equitable power to remedy constitutional wrongs because the allegations set forth here arise under the Constitution and laws of the United States.

5.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 since Plaintiff is a resident of the State of Pennsylvania, a substantial part of the violations and resulting injury alleged here originated in Washington, DC, and the named Defendants are employed by the Federal Government, two of which are based in Washington, DC.

6.      This Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

7.      This Court has the authority to grant injunctive relief in this action pursuant to 5 U.S.C. § 702, Rules 65 and 65(a) of the Federal Rules of Civil Procedure.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred, and continues to occur, in this district.

## III. THE PLAINTIFF

9.      Plaintiff Brian A. Davis is a federal prisoner committed to the custody of the Federal

Bureau of Prisons (BOP).  In 1993 Mr. Davis was convicted in the United States District Court for the Northern District of Texas of conspiracy to possess with intent to distribute 50 grams or more of cocaine base ("crack cocaine"), in violation of 21 U.S.C. §§ 841(a), 841(b)(1) and 846.  Mr. Davis has been in BOP custody for more than two decades.  The BOP, as part of its Intergovernment Agreement with commercial sources, ceded custody over Mr. Davis to the Geo Group, Inc., a private corporation under contract with the BOP to house federal prisoners at its privately operated prisons. (*See*, 18 U.S.C. § 4002).  The Moshannon Valley Correctional Center (MVCC) is one of the many privately operated prisons owned by the Geo Group, Inc.  Mr. Davis is currently confined at MVCC, which is located at: 555 Geo Drive; Philipsburg, Pennsylvania 16866.

## IV. THE DEFENDANTS

10.    Defendant Deborah Leff ("Defendant Leff"), at all times relevant to this action, is the current Pardon Attorney assigned to process applications for presidential pardons and sentence commutations submitted by federal prisoners under the supervision and care of the BOP.  Defendant Leff heads the Office of the Pardon Attorney, which is a division within the U.S. Department of Justice (DOJ).  Defendant Leff's principal place of employment with the DOJ is in Washington, DC at: the Office of the Pardon Attorney, Washington, DC 20530.

11.    Defendant Jeh Johnson ("Defendant Johnson"), at all times relevant to this action, is the current Secretary of the Department of Homeland Security who has been bestowed the responsibility of performing specific governmental functions that involves enforcement of the nation's immigration laws in a manner commensurate with the requirements of the United States Constitution, statutes created by Congress designed to regulate the immigration process, and regulations codified under the Immigration and Nationality Act and Code of Federal Register in order to ensure fair processing of DHS's prosecution of immigration violations.  Defendant Johnson

3

is also commissioned with the responsibility of ensuring that the agency's extension of available benefits, privileges, and its discretionary powers are implemented in conformance with federal law and the United States Constitution. This responsibility is ordinarily delegated to various attorneys and Deportation Officers employed by DHS authorized to act on behalf of the Secretary. These personnel operate under the supervision of the Secretary. Defendant Johnson's principal place of employment with DHS is in Washington, DC.

12.   Defendant S. Gingerich, Jr. ("Defendant Gingerich"), at all times relevant to this action, is a Senior Deputy Deportation Officer employed by DHS and is one of Defendant Johnson's subordinates who has been assigned the responsibility of executing removal proceedings by preparing and issuing Notices to Appear (NTA), the document used by DHS to present its allegations and legal bases for moving to remove an alien from the United States. Once an alien is served with an NTA and the NTA is filed with an Immigration Court, at that point the alien's removal proceedings officially commences. Mr. Davis' NTA, on which Defendant Gingerich's signature appears, was prepared and issued by Defendant Gingerich. Defendant Gingerich's principal place of employment with DHS is in York, Pennsylvania at: 3400 Concord Road, Suite 2; York, Pennsylvania 17402.

## V. PPRELIMINARY STATEMENT

13.   Mr. Davis has been in federal prison since he was twenty-one years old based on his alleged involvement in a drug conspiracy when he was seventeen years old. Although *all* the evidence that have been used to obtain Mr. Davis' drug conviction and justify his lengthy incarceration have completely been discredited, Mr. Davis continues to languish in prison.

14.   Even more dismaying, the officials named here, fully aware of the tragic circumstances under which Mr. Davis' conviction and incarceration have occurred and the many years of

4

emotional anguish that his unjustifiable conviction and incarceration have rendered upon him and his family, have taken deliberate steps to both prolong and worsen those tragic circumstances.

15.    Defendant Leff, presented with the decision of whether to submit Mr. Davis' application for clemency to President Obama in compliance with the standard underlying the President's Clemency Initiative that was expressly set as a prerequisite for each applicant to meet in order to have their application approved for clemency, decided against submitting Mr. Davis' application to the President for consideration because of Mr. Davis' national origin, and because of illegitimate concerns that the DOJ has about the circumstances of Mr. Davis' criminal case.    As the circumstances of Mr. Davis' criminal case and background show (both of which will be expounded upon below), the objectives of restoring justice underlying the President's Clemency Initiative not only address those circumstances in exact form, but the President's Clemency Initiative is also design as a specific means of providing relief to applicants like Mr. Davis seeking a reduction in their sentences by making readily available the rare benefit of a presidential clemency or pardon.

16.    In addition to the allegations circumscribing Defendant Leff's conduct, the allegations outlined here also address two distinct forms of due process violations: the first is based on DHS's efforts to remove Mr. Davis from the United States based on materially false evidence and information which contravene with the requirement of 8 U.S.C. § 1229a(c)(3)(A) ("No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence."); the second is based on DHS's refusal to extend Mr. Davis the process that he is due in order to properly and fairly determine his deportability as explained by the United States Supreme Court in Judulang v. Holder, 132 S.Ct. 476, 490, 181 L.Ed.2d 449 (2011).

17.    Mr. Davis, who was born in Jamaica, arrived in the United States when he was a young child and as a lawful permanent resident. (*See*, Joint Appendix "JA" 149-152).  On February 11,

5

2015, Mr. Davis was served with an NTA prepared and signed by Defendant Gingerich which officially commenced removal proceedings against him. (JA. 153-156). The basis of the NTA's allegations for Mr. Davis' removal rest, in part, on Mr. Davis' drug conviction which, in itself, has soundly been proven to have been procured based on materially false evidence and information.

18.   The other aspect of the NTA's basis for Mr. Davis' removal is based on an incorrect allegation that Mr. Davis served a four-year prison sentence *prior to* the prison term that he is currently serving. This allegation has been used by Defendant Gingerich to establish that Mr. Davis is removable based on the ground of moral turpitude under the Immigration and Nationality Act (INA). (JA. 155-156). Despite Mr. Davis' ongoing attempts at challenging the veracity of this allegation and the other allegations contained in the NTA, his efforts have repeatedly been stymied, and DHS continues to arbitrarily rely on the unfounded allegations delineated in its NTA as a means of establishing its burden under 8 U.S.C. § 1229a(c)(3) of proving by clear and convincing evidence that he is in fact deportable and therefore should be deported. Cf. 8 U.S.C. § 1229a(c)(3) (Stating that the Government must prove deportability by clear and convincing evidence).

19.   In order for Mr. Davis to avoid being ordered removed permanently from the United States and from his family based on a drug conviction for which *all* the evidence presented have been completely disproved and based on an allegation made against him by Defendant Gingerich that never occurred, the Constitution and laws of the United States have provided him with the necessary means to challenge the Defendants' egregious attempt to deport him in violation of his constitutional rights. And as the Supreme Court observed in Obergefell v. Hodges, 192 LEd.2d 609 (2015), "[t]he Nation's courts are open to [him] … [to] invoke a right to constitutional protection when he [] is harmed," rather than him having to first be subjected to an unlawful deportation order and then be thrust in the position of fighting to restore his rights and his liberty through a protracted

appeal process.

20.    Under <u>Judulang v. Holder</u>, the Supreme Court explained that a lawful permanent "alien who has long resided in this country" and is faced with deportation "has [a] *right* to remain here," <u>Judulang</u>, 181 LEd.2d at 464 (emphasis added), and that DHS's efforts to deport him must take into account his "fitness to reside in this country," <u>id</u>. 464, and "must be tied [] to the purposes of the immigration laws or the appropriate operation of the immigration system." <u>Id</u>.  As the allegations below will show, the standard of "fitness" established by the Supreme Court has been effectively abdicated in Mr. Davis' deportation proceeding, having been replaced with efforts to deport him that are alarmingly capricious and arbitrary, and undeniably unfair and callous.

21.    As stated, Mr. Davis has been in federal prison since he was twenty-one years old based on his alleged involvement in a drug conspiracy when he was seventeen years old.  And even though the evidence that have been used to obtain Mr. Davis' drug conviction and justify his lengthy incarceration have been completely discredited, he continues to languish in prison and now faces a further loss of liberty and permanent separation from his family based on a fundamentally unfair and invalid conviction, and on an allegation that he previously served a four-year prison term that is not true. Cf. <u>Moore v. United States,</u> 571 F.2d 179, 184 (3rd Cir. 1978) (observing that "if Moore in fact were sentenced on the basis of an understanding about other criminal behavior that was fundamentally incorrect, the values of accuracy, rationality and fairness in the criminal process as it bore upon Moore were jeopardized."), *relying on* <u>Townsend v. Burke</u>, 334 U.S. 736, 92 LEd. 1690 (1948) (observing that "a prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue.  Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand.").

22.    Mr. Davis has lived through decades of emotional and psychological distress based on a

drug conspiracy conviction and an ensuing life sentence that continues to wobble on pillars of fabricated events and information. And while Mr. Davis continues to be plagued with this nightmare masquerading as justice served, he is now confronted with the prospect of being forced to re-live yet another act of injustice and all the challenges and adversity that follows as DHS continues its effort to banish him from the United States and from all the family and friends that he knows, ultimately exiling him to a country in which he has no ties and no means of obtaining the support that he will need after serving more than two decades of an unjust incarceration.

23. The allegations delineated below will show that Defendant Leff exercised her authority as Pardon Attorney in an arbitrary and capricious manner in violation of the Administrative Procedure Act, that Defendant Leff abused the power bestowed upon her, and that Defendant Leff employed a method of selective enforcement based on Mr. Davis' national origin in deciding against submitting his application for clemency to the President in violation of the Equal Protection Clause to the United States Constitution. It is important to note that Mr. Davis is not challenging the President's denial of his application for clemency, but rather the method employed by Defendant Leff in determining whether to present his application for clemency to the President.

24. Likewise, the allegations outlined below will also show that Defendant Johnson, through his subordinates, has exercised, and is continuing to exercise, his authority as DHS Secretary in an arbitrary and capricious manner in violation of the Administrative Procedure Act, that Defendant Johnson, by and through his representatives, have engaged, and are continuing to engage in oppressive government conduct and an egregious abuse of power, in violation of Mr. Davis' First, Fifth and Eighth Amendment rights and Mr. Davis' Fifth Amendment right to the pursuit of happiness and to be treated with the dignity that is central to the precept of a free people whose institutions are founded upon the doctrine of equality. As Mr. Davis will show below, the

Defendants' actions have offended the democratic ideal upon which our nation was founded—those ideals that are rooted in the concept of natural law, natural right, human dignity, and equality.

25.   It is further alleged that Defendant Johnson is responsible for creating and maintaining a policy and custom that have allowed his subordinates to engage in conduct and practices that have resulted in a violation of Mr. Davis' constitutional rights.

26.   Also, the allegations outlined below will show that Defendant Gingerich has exercised, and is continuing to exercise, his authority as DHS's Senior Deputy Deportation Officer in an arbitrary and capricious manner in violation of the Administrative Procedure Act, and that Defendant Gingerich has engaged, and is continuing to engage, in oppressive government conduct and an egregious abuse of power, in violation of Mr. Davis' First, Fifth and Eighth Amendment rights and Mr. Davis' Fifth Amendment right to the pursuit of happiness and to be treated with the dignity that is central to the precept of a free people whose institutions are founded upon the doctrine of equality.

27.   Mr. Davis will show that his criminal history and personal background comports with the Supreme Court's standard for evaluating whether he is "fit" to remain in the United States and what the Defendants must prove in order to establish his removal from the country—a process that the Defendants have steadfastly refused to apply to his deportation proceedings. Cf. Judulang v. Holder, 181 Led.2d at 464.  Mr. Davis will also show that his personal background and criminal history are in alignment with objectives underlying the President's Clemency Initiative project, and that Defendant Leff acted arbitrarily, capriciously, and abused her discretion in declining to favorably recommend to the President to approve his clemency application.  As a result of the Defendants' conduct, judicial action is most needed here in order to preserve Mr. Davis' due process right, his liberty, and those ideals that we all hold dear.

28.   As stated, if Mr. Davis is to be banished from the country, the United States Supreme Court has explained that his expulsion must be based on a fair assessment of whether he is unfit to remain here. Cf. Judulang v. Holder, 132 S.Ct. 476, 181 LEd.2d 449 (2011).

## VI. BASIS FOR COMPLAINT AND FACTUAL ALLEGATIONS
### PART A: Rationale Given For The President's Clemency Initiative

29.   Under Article II, § 2 of the United States Constitution, the President is clothed with the exclusive authority to grant clemency, executive pardon, or commute the sentence of any federal defendant serving a federal sentence.

30.   As recent as 2013, President Obama, in response to growing public outcry surrounding the mass incarceration of African-Americans and Latinos sentenced for non-violent drug offenses, many of whom have been incarcerated for decades, announced plans to use his exclusive authority under the Constitution to grant clemency to thousands of non-violent drug offenders who meet certain pre-determined requirements.  This wide-scale exercise of the President's authority to award clemency has never before been implemented in the nation's history.  In President Obama's case, his decision to exercise his clemency authority in such an unprecedented way came as a result of Congress' lack of effort in passing legislation that would allow non-violent drug offenders languishing in federal prisons an opportunity to obtain relief from the stringent, and in many cases, draconic prison sentences that were imposed upon them over the previous two decades as a result of a war that has been waged against drugs.

31.   Following the President's announcement of his Clemency Initiative, he and other members of his administration began speaking publicly about the injustice that inhere in the nation's drug laws and the disproportionate impact that the injustice has had on the African-American community, particularly young black men.  In a statement in the Washington Post editorial last

summer regarding criminal justice reform and why it should be a priority for the country and is morally necessary, the President, specifically talking about young people who have languished in federal prisons for the past two decades as a result of the war against drugs, explained that "[w]hen they described their youth, these are young people who made mistakes that aren't that different from the mistakes I made, and the mistakes that a lot of [other successful members of our society] made." The President went on to state that "[t]he difference is that they did not have the kind of support structure, the second chances, the resources that would allow them to survive those mistakes." The President concluded by stating that "I believe that at its heart, America is a nation of second chances.  And I believe these folks deserve their second chances." Id, cf. (July 15, 2015 Edition of Washington Post).

32.    Adding to the President's statements, White House senior adviser, Valerie Jarrett, also stated in the Washington Post that the President meets regularly with young people of color and has spoken of how they face a less forgiving environment than he experienced growing up.  Ms. Jarrett stated: "[The President] just wants to make sure *they don't get unfairly stuck in the criminal justice system because they've made mistakes early in their lives, without the ability to ever have a second chance.*" (emphasis added).

33.    In a similar tone, United States Deputy Attorney General, James M. Cole, added: "For our criminal justice system to be effective, it needs to not only be fair, but it also must be perceived as being fair.  These older, stringent punishments that are out of line with sentences imposed under today's laws erode people's confidence in our criminal justice system." (Remarks at the N.Y. State Bar Association Annual Meeting (Jan. 30, 2014), available at: speeches/2014/dag-speech.140130).

34.    In response to the President's Clemency Initiative, the Clemency Project 2014 was formed.  Deputy Attorney General Cole formally announced the new initiative as part of an effort to

encourage qualified federal inmates to petition to have their sentences commuted or reduced by the President.   Numerous attorneys and groups were asked to volunteer their assistance under the umbrella Clemency Project 2014 in an effort to fast-track the myriad applications that were expected to be filed.   According to Deputy Attorney General Cole, the expectation was that the clemency initiative "will go far to promote the most fundamental of American ideals—equal justice under law." (Remarks at Press Conference Announcing the Clemency Initiative (April 23, 2014), available at: speeches/2014/dag-speech-140423.html); *see also* (Press Release, U.S. Department of Justice, Announcing New Clemency Initiative, Deputy Attorney General James M. Cole Details Broad New Criteria for Applicants (April 23, 2014), available at: April/14-dag-419.html).   Deputy Attorney General Cole noted that the initiative was not limited to crack offenders, but to "worthy candidates" who meet six specific criteria. Id.   Those six criteria are: (1) the applicant is serving a federal sentence that likely would have been lower if he was convicted of the same offense today; (2) he was a non-violent, low-level offender without significant ties to large-scale criminal organizations, gangs, or cartels; (3) he has served at least 10 years of his sentence; (4) he does not have a significant criminal history; (5) he has demonstrated good conduct while in the BOP; and (6) he has no history of violence before the offense or during his term of incarceration.

35.   In or around October of 2014, Mr. Davis' case-file was submitted to the Clemency Project 2014 to be included among a list of qualified applicants for clemency.   The list was then submitted to the Office of the Pardon Attorney for consideration whether to submit the applicants' name to the President with a *favorable* recommendation to grant clemency.   The list of applicants was prepared by volunteer attorneys from the Office of the Federal Public Defender in the District of Maryland.

36.   After more than a year following the submission of Mr. Davis' application for clemency

to the Office of the Pardon Attorney, in a memorandum dated January 6, 2016, Defendant Leff notified Mr. Davis that his application for clemency was denied on January 5, 2016. (JA. 159).

**PART B: <u>Office of the Pardon Attorney and the Clemency Process</u>**

37.   The Office of the Pardon Attorney (OPA) is a division within the DOJ assigned to carry out the function of assisting the President in the exercise of his clemency powers.   The OPA receives petitions addressed to the President for all forms of executive clemency (including pardon, commutation of sentence, remission of fine, and reprieve) for federal criminal offenses, and in turn conducts the appropriate investigations on the merit of those petitions.   The OPA then uses the information collected to prepare reports ("letters of advice") advising the President about the recommended disposition of individual cases.   The "letters of advice" contain analysis of the applicant's offense, rehabilitation and suitability for clemency, and the likely impact of a grant of clemency.

38.   Although the President is free to disregard OPA's recommendation or to act without any involvement from the OPA whatsoever, *the President has traditionally relied heavily on the OPA's advice in clemency cases to inform his decision-making.*

39.   If the President decides to deny clemency, the Office of the Counsel to the President provides the OPA with a written notification that the request for clemency has been denied.   This written notification serves as the official record of the President's action on the clemency requests of those applicants, and is retained by OPA, which places a copy of the notification in the individual applicant's clemency file and also records the information in OPA's automated database.   OPA maintains lists of clemency applicants whose applications have been denied by the President.

40.   Pursuant to 28 C.F.R. § 0.35, the Pardon Attorney, under the supervision of the Attorney General, "shall have charge of the receipt, investigation, and disposition of applications [for

executive clemency]." Id.   The Pardon Attorney must then submit her recommendation to the Attorney General (28 C.F.R. § 0.36) and, after review and possible investigation, the Attorney General must advise the President as to whether, in his judgment, the request for clemency merits favorable action by the President. (28 C.F.R. § 1.7(b)).

41.   Germane to the foregoing sequence, the United States Supreme Court has stated that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L. Ed.2d 443 (1983); cf. 5 U.S.C. § 555(e).

### PART C: Mr. Davis' Criminal Case And History

42.   As stated, Mr. Davis was born in Jamaica.  He arrived in the United States on or around May 3, 1982 as a lawful permanent resident. (JA. 149-152).   In America, Mr. Davis attended elementary school in Brooklyn, New York (P.S. 135), middle school (Winthrop Junior High), and high school (Samuel J. Tilden High School), also in Brooklyn, New York.  Mr. Davis later attended Blackstone Paralegal Studies and Ashworth University while serving his federal sentence. (JA. 138-139).

43.   In December of 1988, Mr. Davis, in his final year of high school, dropped out of school, left home, his job, and ventured to Dallas, Texas with friends from his neighborhood.  His reason for leaving was to separate himself from a situation at home that made life miserable for him.

44.   Shortly after arriving in Dallas, Mr. Davis was arrested on December 13, 1988 and remained in jail until January 24, 1989. (JA. 53, 97).   Thereafter, Mr. Davis was arrested on a number of different occasions, (JA. 54-57, 117), including an arrest by immigration officials where he spent several months in immigration detention because he was unable at the time to verify that he

was in fact who he said he was. (JA. 118).

45.   All in all, from the time of Mr. Davis' arrival in Dallas in December of 1988 up until his departure in mid-to-late1990, he spent more than a year in various forms of detention, including six months in a Dallas County jail from October 5, 1989 to March 23, 1990. (JA. 97).

46.   In April of 1989, Mr. Davis pled guilty to a theft offense that stemmed from him renting a car from a drug addict for $50 which belong to the addict's mother who, unbeknownst to Mr. Davis, had reported the car stolen. (JA. 119-120).  Mr. Davis was pulled over in Sulpher Springs, Texas while driving the car and was charged with unauthorized use of a motor vehicle. (JA. 56). The charge was later dropped by Sulpher Springs, but was subsequently picked up by Dallas County which later prosecuted Mr. Davis.  Mr. Davis pled guilty to theft because doing so meant immediate release.  He later successfully served four years' probation for the offense.

47.   During Mr. Davis' time in Dallas, numerous attempts to kill him were made by several of the men who he was said to have worked for selling crack cocaine and who later testified against him during his trial.  These attempts include three separate shootings, one involved the destruction of a taxi cab in which Mr. Davis was riding, and another resulting in an individual who was next to Mr. Davis getting shot and Mr. Davis having to provide a statement to the police after an ambulance was called; another involved Mr. Davis being tortured. (JA. 113).

48.   Following Mr. Davis' release from jail on March 23, 1990 after having been acquitted by a judge on drug charges, although he promised his mother that he would leave Dallas and return home to rebuild his life, he discovered for the first time that he had a son living in Dallas.  To further complicate matters, the young lady with whom Mr. Davis had a child had given paternal rights to her boyfriend by lying to him that he was the child's father and naming the child after him, which the young lady did presumably because at the time she hardly knew anything about Mr.

Davis, had not seen or heard from him in months, and was under the assumption that she would not see or hear from him again.

49.   Once Mr. Davis showed up, although the boyfriend and the child's grandmother, along with everyone else around, immediately recognized who the child's true father was, the young lady, in the beginning, was dead-set against acknowledging that Mr. Davis was in fact the child's father. As a result, it became undeniably obvious to Mr. Davis that he could not leave Dallas under those circumstances, and that he would have to break his promise to his mother.

50.   Ultimately Mr. Davis succeeded in getting the young lady to acknowledge that he is the child's father, which was helped by some reprimanding from the young lady's mother.  He was also able to allay the young lady's fear about him taking the child away from her and returning to New York with the child—a process that began with Mr. Davis giving the young lady all the money that was given to him by his mother for his plane fare to New York, which he did to show that he had genuine and sincere intentions of supporting and caring for his child.  Mr. Davis' son was born Gerald Frazier on January 13, 1990.

51.   Thereafter, Mr. Davis was gradually allowed to spend time alone with his Gerald which eventually became a frequent occurrence.  But because Mr. Davis often stayed with different friends which also included the times when he had Gerald to himself, Gerald's mother did not always have a contact to get in touch with him.  This later led to Gerald's mother calling the police and reporting that Mr. Davis had kidnapped Gerald after Mr. Davis had been absent with Gerald for nearly two weeks without calling Gerald's mother.  Fortunately for Mr. Davis, in spite of his irresponsibility Gerald's grandmother intervened on his behalf, convincing the police that his intentions towards Gerald and his mother were good which proved to be true as Mr. Davis eventually showed up with the child.

52.   Once it became clear to Mr. Davis that in order for Gerald to have a successful future, he, himself, would have to get his life in order, in mid-to-late 1990 he returned home to New York to live with his mother who at the time had moved on from the situation that caused Mr. Davis to leave home in the first place.  At the time Mr. Davis had just turned 19 years old.

53.   While changes in attitude, behavior, and psychological development are generally difficult to implement, particularly for a young person without a mentor and the necessary intellectual training needed to correctly make important life choices, Mr. Davis, after arriving in New York, embarked on the difficult challenge of taking control of the direction of his life by embracing his desire to reach for something better, humbling himself, and figuring out how to work towards building a productive future that would allow him to properly care for himself and his son without placing either of them in harms way.  He began working in his mother's beauty salon which, in itself, turned out to be a humbling experience.

54.   While the transition towards self-improvement was not always fluid as can be gleaned from a poor decision that Mr. Davis made in March of 1991 to travel with friends to Charleston, West Virginia, (JA. 97)—a decision that became a defining moment in what it means not to look back and when it is necessary to sever destructive relationships, Mr. Davis ultimately succeeded in becoming gainfully employed.  He worked for the Greyhound Bus Company at Port Authority, New York, in baggage claim and janitorial services; he worked for a charitable organization based in Bronx, New York, where he was entrusted with the responsibility of collecting financial donations for disabled New York City police officers; and he worked for a construction company (Laveta Construction / L. Edwards Home Improvements) based in Brooklyn, New York, doing menial labor. (JA. 99, 110).  But as has been the theme throughout whenever government officials evaluate accomplishments made by Mr. Davis that humanizes him and in some way present him in a positive

light, the Probation Officer who prepared Mr. Davis' Presentence Report (PSR) made a point of raising doubt about his employment history by commenting that Mr. Davis "claim[ed]" to have been employed from 1991 up until his arrest, (JA. 99), notwithstanding the fact that documents were submitted to verify Mr. Davis' employment history, including IRS tax return forms, and the fact that he was arrested at his job-site after *he* called the authorities to self-surrender. Id.

55.   On September 14, 1992, Mr. Davis was arrested by New York City police officers for robbery, robbery with physical injury, robbery in the 3rd degree, assault with intent to cause physical injury, criminal possession of a weapon, and criminal possession of stolen property. (JA. 97).  While these are obviously serious charges, the reality is that the outcome of this arrest nearly resulted in the filing of a civil complaint on behalf of Mr. Davis against the arresting officers and the City of New York for civil rights violations.  But because Mr. Davis was arrested a month later on October 14, 1992 based on the current federal drug conspiracy charge, that changed the trajectory of the suit.

56.   In any event, on the morning of September 14, 1992, an errant taxi driver struck the vehicle that Mr. Davis was driving (a 1991 Nissan Pathfinder that was leased by Mr. Davis' mother) and fled.  Mr. Davis gave chase and both vehicles came to a stop exactly in front of a police precinct in Brooklyn which is located directly at the corner of a major street.  Both vehicles stopped approximately 20 to 25 feet away from the front entrance of the precinct with Mr. Davis' vehicle blocking the taxi.  As stated, the incident occurred in the morning around the time police officers were engaged in shift-change and were going in and out of the precinct.  There were approximately eight police officers standing about 15 to 20 feet away from where Mr. Davis and the taxi came to a stop, which is a parking area that is adjacent to the street.

57.   Mr. Davis exited his vehicle and walked towards the taxi, mindful of the police presence.  At the same time, the taxi driver exited his vehicle and walked towards Mr. Davis.  Although Mr.

Davis was upset, his focus was to discuss the damage to his vehicle. But to Mr. Davis' surprise, the moment the taxi driver (a man much older than Mr. Davis and towered over him) approached him, he grabbed Mr. Davis by the throat with his hand while hurling threats. Instinctively, Mr. Davis chopped the man's hand away from his throat and began hurling punches at the man. Almost immediately the police officers standing in the area came over and separated Mr. Davis and the man. Mindful of the situation, Mr. Davis pointed out that he was attacked and that he defended himself. Mr. Davis further explained that the man had hit his vehicle and fled, and pointed to the damage at the rear of the vehicle that was caused by the man's taxi.

58.   Rather than the officers focusing on the complaint that Mr. Davis was making, they instead began to profile him by asking him whether he had any guns or drugs in his vehicle. This infuriated Mr. Davis and he foolishly began to hurl expletives at the officers who in turn took offense. While several of the officers moved over to the taxi driver to converse with him, one of the officers on the scene calmly told Mr. Davis to leave before he got himself into trouble. This caution, which Mr. Davis interpreted as an empty threat, succeeded only in sustaining his anger until it was too late—his mouth landed him in jail with the litany of robbery and assault charges outlined above.

59.   Mr. Davis had in his possession an antique pocket knife with a fold-in blade that the officers reported was used by Mr. Davis to cut the man while he robbed him (there was obviously no knife wound found on the man). Ultimately, the PSR issued in Mr. Davis' federal drug conspiracy case accepted the police report as true that Mr. Davis violently robbed a man for $10 directly in front of the front entrance of a police precinct at approximately 8:00 a.m. while approximately eight police officers and a small crowd on pedestrians watched. And unfortunately for Mr. Davis, this narrative is still being used against him to this day.

60.   The attorneys who represented Mr. Davis on the above robbery and assault charges got the case brought before a grand jury to get it thrown out after the District Attorney's Office decided to proceed with prosecuting the charges.  Mr. Davis ended up testifying before the grand jury, which resulted in the charges being dismissed. (JA. 97).

61.   On October 14, 1992, Mr. Davis, after discovering that a federal warrant had been issued in Dallas for his arrest, called federal authorities and self-surrendered at his job-site despite his mother's objections and instructions for him to first retain counsel.  Mr. Davis self-surrendered because he foolishly thought that doing so would matter, at least in consideration of whether he would be released on bond.  He also naively thought that the authorities would take into consideration the fact that he elected to face the charges filed against him rather than flee when he discovered that a warrant had been issued for his arrest.  Two weeks prior to Mr. Davis' arrest, he had just turned twenty-one years old.  Several months later, his second son, Brandon Davis, was born.

62.   Mr. Davis, along with 60 other defendants, were named as co-conspirators in a multi-kilogram crack cocaine distribution organization that was said to have operated principally in Dallas, Texas. (JA. 92).  The organization, dubbed "the Allen Organization," was said to have been headed by a man named Anthony Allen.  With the exception of Mr. Davis and two other co-conspirators who Mr. Davis had never met prior to his arrest—a fact that is established in court documents, every other named co-conspirator (with the exception of those against whom the case was dismissed) pled guilty to conspiracy and agreed to cooperate with the government, including testifying if necessary.  Mr. Davis and the other two co-conspirators proceeded to trial.

63.   On October 21, 1993, Mr. Davis was convicted in the United States District Court for the Northern District of Texas of conspiracy to possess with intent to distribute 50 grams or more of

cocaine base (crack), in violation of 21 U.S.C. §§ 841(a), 841(b)(1) and 846 (Count One).  He was also convicted of conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 371 (Count Three). (JA. 92).  Mr. Davis was not named in Count Two of the indictment, which charged a continuing criminal enterprise under 21 U.S.C. § 848.

64.    Mr. Davis was found to have been involved in the conspiracy over a two-year period when he was seventeen and nineteen years old.  And as stated above, of those two years, Mr. Davis spent more than a year in various county detention.

65.    At sentencing, the district court imputed to Mr. Davis amounts of crack cocaine that the district court determined had been possessed by other members of the conspiracy, concluding that on this basis 23 to 41 kilograms of crack cocaine could be attributed to Mr. Davis. (JA. 30, 41).  The district court emphasized that it was not relying on the portion of the government's evidence that Mr. Davis personally possessed in excess of 15 kilograms of crack cocaine, an argument that the government vehemently tried to make. (JA. 68, 51-52, 57-58, 65).

66.    Under the Sentencing Guidelines in effect at the time, this quantity yielded a base offense level of 42. (JA. 67).  The district court then applied enhancements that increased Mr. Davis' offense level to 46, which the court then reduced to a final offense level of 43 for sentencing purposes.  Mr. Davis was assigned a criminal history category of II on account of his theft conviction.  When combined with a total offense level of 43, Mr. Davis' Guideline sentencing range was mandatorily set at life imprisonment without the possibility of parole. (JA. 80).  Accordingly, the district court sentenced Mr. Davis to life imprisonment without the possibility of parole. Id.

67.    On June 19, 2008, the district court reduced Mr. Davis' life sentence to 30 years in response to a petition filed by Mr. Davis under 18 U.S.C. § 3582(c)(2) based on Amendment 505 to the Federal Sentencing Guidelines. (JA. 5).

68.   Later in May of 2015, the district court granted a § 3582(c)(2) petition filed by counsel for Mr. Davis which sought a reduction in Mr. Davis' sentence based on the recently promulgated Amendment 782 to the Federal Sentencing Guidelines, (JA. 6), which was issued in the wake of Brian A. Davis v. U.S. Sentencing Commission, 716 F.3d 660 (D.C. Cir. 2013).  The district court's Order reduced Mr. Davis' 30-year sentence to 27 years. Id.

69.   During Mr. Davis' trial, he essentially conceded to Count Three in the indictment which was based on a number of Western Union money transfers that he had made on behalf of a friend who was also a named co-conspirator. (JA. 61, 106, 111-112).  Mr. Davis conceded to Count Three knowing that doing so meant that he was going away to prison for five years. (JA. 112).  The money transfers were all made after Mr. Davis' release from jail in March of 1990.

**PART D: <u>Analysis of the Evidence Underlying Mr. Davis' Federal Conviction</u>**

70.   The entire evidence upon which Mr. Davis' drug conspiracy conviction rests consist of the following testimony and information.  To begin with, the jury was told repeatedly that Mr. Davis was responsible for generating in excess of $100 million selling crack cocaine when he was 17 years old even though no evidence was presented to support that allegation—i.e., no evidence that Mr. Davis has ever owned or purchased anything of value in his entire life to support the idea that he was responsible for making over a $100 million selling crack; no evidence that Mr. Davis was ever found to be in possession of any drugs or substantial amount of cash at anytime in his life to justify him being responsible for generating in excess of $100 million in drug proceeds; and no evidence that the conspiracy itself in fact engaged in such large-scale drug distribution.  Mr. Davis did make one purchase of an item of value, however—a $4,000 motorcycle that he was only able to purchase by making a series of payments before he was able to take possession of the motorcycle.  The purchase of the motorcycle is a part of the trial record.  Ultimately, the motorcycle itself became a

huge focus during Mr. Davis' trial.

71.   During the trial, a co-conspirator named Calvert Trew (the second-in-command in the conspiracy and the government's star witness) testified that he was contacted by Anthony Allen, the conspiracy's putative leader, who instructed him to give Mr. Davis nine (9) ounces of crack cocaine which Mr. Davis in turn smuggled to Dallas on behalf of Anthony Allen. (JA. 43-44, 63-64).  The jury, however, was not told that Mr. Davis and Anthony Allen had never met, never had any conversation with each other, and knew absolutely nothing about each others' existence prior to Mr. Davis' arrest on October 14, 1992.  This fact is corroborated by the circumstances of the case, by a conversation that Anthony Allen had with Mr. Davis' trial attorney, (JA. 13-14, 19), and by an affidavit submitted by Anthony Allen in a different legal matter. (JA. 7-9).  As the record of the case shows, Mr. Davis' trial attorney attempted to establish the unreliability of Calvert Trew's testimony and statements, but his efforts were rebuffed. (JA. 14-17).

72.   Calvert Trew further testified that while he was a member of the conspiracy he had only seen Mr. Davis four times, and he *never* had a conversation with him.

73.   Colnick Grignion, one of the conspiracy's leaders, testified that "he never saw Mr. Davis do[ing] anything," (JA. 114), and that just because individuals were hanging around one another, that doesn't mean that they were part of the organization. (JA. 113).  Grignion really did not have much to say about Mr. Davis.

74.   Christopher Hemmings, also one of the conspiracy's leaders, testified that Mr. Davis assisted him with smuggling drugs from New York to Dallas in a car.  Hemmings testified that it was he, Mr. Davis, and two other co-conspirators traveling in the car, that Mr. Davis was driving when the car was pulled over by the police who searched the car and its occupants but did not discover the drugs, and that Mr. Davis was issued three traffic citations during the stop.  Hemmings

23

also testified that Mr. Davis worked for him selling crack cocaine while he was in Dallas.

75.    Hemmings and the other two co-conspirators (Kirk Hudson and Duane Knight) who Hemmings claimed were traveling in the car with him and Mr. Davis were cooperating witnesses for the government.   And all three individuals testified against Mr. Davis during his trial.   However, what is striking about the event testified to by Hemmings is the fact that *only* Hemmings had any recollection about the event taking place; the other two individuals (Hudson and Knight) had no knowledge whatsoever of the event ever taking place even though, according to Hemmings, they were both riding in the car when it was stopped and searched by the police who supposedly issued Mr. Davis three traffic citations.   Equally striking is the fact that none of the three traffic citations could be found.

76.    Hemmings further testified that he did not trust Mr. Davis and thought that he was a "snitch." (JA. 59-60).   Even though the government's theory of Mr. Davis' involvement was that Mr. Davis was a part of Fitzroy Allen's crew (Fitzroy Allen being brother to Anthony Allen) of which Hemmings was a part, when Hemmings was asked to described who the members of Fitzroy Allen's crew were, he never mentioned Mr. Davis. (JA. 115-116).

77.    Hemmings also testified that Mr. Davis moved one of the conspiracy's workers (Devon Foster) from one drug distribution outlet to another in September of 1990. (JA. 40-41, 61).   This allegation not only contributed to Mr. Davis' conviction, but it also served as the government's *sole* basis for establishing that Mr. Davis exerted a certain level of supervision over low-level members of the conspiracy, (JA. 62, 72), which in turn led to his leadership role enhancement at sentencing. (JA. 33, 96).   What the jury was not told, however, was that Devon Foster was *never* in Dallas at any time in 1990.   Moreover, no statement from Devon Foster was submitted into evidence, nor were there any police report provided indicating that Devon Foster was in fact arrested in Dallas at

any time during 1990 as testified to by a special agent assigned to the case. (JA. 38, 40).

78.    Lastly, Hemmings, who shot and killed one of his workers, David Colon, once attempted to kill Mr. Davis when he fired a flurry of gun shots at him, missing, but hitting an individual (Mark Hillary) who was next to Mr. Davis.   Mr. Davis escaped death by what he described as divine intervention as the gun ran out of bullets and he was able to flee.   Thereafter, Mr. Davis called an ambulance for Hillary and ended up having to provide a statement to the police.

79.    Kirk Hudson, one of the conspiracy's lieutenants and cousin to Christopher Hemmings, testified that Mr. Davis, a seventeen year old, had established a cocaine connection with a cocaine supplier named Charley and that the cocaine obtained through this individual supplied the conspiracy. (JA. 51-52).

80.    There were 61 people named in the conspiracy in which Mr. Davis was charged. (JA. 87-91).   Calvert Trew and Colnick Grignion (two of the conspiracy's leaders) testified at length about where and from whom the conspiracy obtained its cocaine. (JA. 111).   Neither Trew nor Grignion or, for that matter, *any other member of the conspiracy* except Kirk Hudson, mentioned anything about Mr. Davis obtaining cocaine through a cocaine supplier named Charley. (JA. 52).   And no one else in the conspiracy (again with the exception of Hudson) had any knowledge about a cocaine supplier named Charley. (JA. 52, 60).

81.    Hudson also admitted during cross examination that he twice attempted to kill Mr. Davis—once when Mr. Davis was riding in a cab which was riddled by bullets fired by Hudson, and the other time when Mr. Davis was in a club.

82.    A Dallas police officer (Officer Mayfield) who, along with his partner were part of a drug trafficking investigation that led to his partner being criminally prosecuted, testified that on April 22, 1989 he and his partner (the same partner prosecuted for drug trafficking) encountered Mr.

Davis and a co-conspirator in an apartment with a quarter kilogram of cocaine and $17,000 in cash. According to Officer Mayfield, Mr. Davis was not arrested.

83.    However, Mr. Davis' jail record conclusively shows that not only was he not in an apartment on April 22, 1989 with a quarter kilogram of cocaine, a co-conspirator, and $17,000 in cash as Officer Mayfield described, but he was in jail *prior to* April 22, 1989 based on his theft offense, (JA. 53), and remained in confinement through and after April 22, 1989.  Equally striking is the fact that the alleged co-conspirator who was supposedly in the apartment with Mr. Davis provided no statement or testimony corroborating this incident; nor were there any explanation provided as to why Mr. Davis was not arrested.  Unfortunately for Mr. Davis, the jury was not made aware of this information.

84.    Mr. Davis' PSR reports that he "was employed as a runner for the Allen Organization" and that "[he] participated as a runner for Ian Barr." (JA. 93).  No information was provided as to whom Ian Barr is, and Mr. Davis is unaware of who this individual is.  Moreover, as can be gleaned from the list of individuals named in the indictment, the name Ian Barr appears nowhere on the list. (JA. 87-91).  Yet part of the evidence presented against Mr. Davis is that he was a runner for this individual.

85.    The PSR also indicates that "[Mr.] Davis report[ed] that he ran away from home when he was 16 years of age to come to Dallas to work for the Allen Organization." (JA. 98).  This information is completely false and make absolutely no sense when considering that Mr. Davis proceeded to trial precisely to contest the government's allegation that he was a member of the Allen Organization.  But assuming, *arguendo*, that Mr. Davis did run away from home at 16 years old to go to Dallas to work for the Allen Organization as the PSR contends, does that justify life imprisonment and the steady flow of opposition from the government that Mr. Davis has been

receiving for more than two decades?

86.    The PSR further alleged that one of the aliases used by Mr. Davis was "English," (JA. 86), which the PSR sought to use to establish that Mr. Davis was in fact responsible for a shooting incident that he was arrested for on December 13, 1988 shortly after his arrival in Dallas. (JA. 93). But nowhere in the voluminous trial record and the mountain of statements provided were there any mention that anyone has ever referred to Mr. Davis as "English." (JA. 23, 48-50).

87.    Lastly, according to the government, the conspiracy originated in the Crown Heights section of Brooklyn, New York, where its members lived.   However, neither Mr. Davis, any member of his family, nor any of his friends have ever lived in Crown Heights.   Nor did Mr. Davis ever attended school or was a part of any community program located in Crown Heights.   The section of Brooklyn where Mr. Davis lived and grew up is miles away from Crown Heights.

88.    On December 13, 1988, almost two weeks after Mr. Davis arrived in Dallas, he was arrested and charged with aggravated assault and attempted murder based on a police report that he shot a man in both legs with a semi-automatic machine gun and that he put the gun to the man's head and pulled the trigger but the gun misfired. (JA. 35-36, 93).  According to the report, the man was able to escape by running away and signaling a police cruiser several blocks away from where the incident occurred. (JA. 35).  Although these charges were later thrown out, (JA. 22-23, 47-50), the record of this arrest has been the bane of Mr. Davis' existence from the time of his arrest by federal authorities on the current conspiracy case, and continues to be a source of disrepute to this day.

89.    At the time of Mr. Davis' arrest on December 13, 1988, the original report was that he was holding a police officer hostage.  This prompted the arrival of tactical unit and local TV news programs.  Once the "police officer hostage" report proved to be false, the revised report was that an

armed man was barricaded inside an apartment.  That report also turned out to be false as Mr. Davis was not "barricaded" in an apartment; and no weapon was discovered in the apartment where Mr. Davis was later arrested.

90.    Once Mr. Davis was taken to a police station, he was questioned about a shooting but declined to provide any information.  His reticence was interpreted as hardball, and he was told that he would be made to talk.  He was then charged, but was released several weeks later as all charges were dropped.

91.    Looking at the incident outlined in the police report through a logical lens, clearly the intended message is that Mr. Davis intended to kill a man.  But a closer look at the entire circumstance shows that the facts represented do not add up.  To begin with, from a sociological standpoint (and this is just acknowledging a cultural truism that we all know exist), it is immensely unlikely that the police and/or the prosecuting attorney would simply drop such serious charges against Mr. Davis if they truly believed that he in fact shot a man in both legs and put a gun to the man's head and pulled the trigger in an effort to kill him.  This unlikeliness seamlessly crosses over to impossibility when considering that black defendants have invariably been convicted on far less evidence than what the police report in this case described.  Secondly, and again applying logic, the question becomes whether it is possible for a person who was shot in both legs by an assailant intent on killing to be able to escape the assailant by "running" on legs that sustained gun shot wounds when all the assailant had to do was simply unjam the gun and proceed with completing the act of killing or simply choose a different route to complete the act?  The answer to that question is obvious, especially when considering that the storyline is an intent to kill.  It also must follow that the assailant would have prevented his intended target (who he shot moments before in both legs) from escaping until he figured out how to consummate the act of killing.

28

92.   Putting a gun to a man's head and pulling the trigger is serious business.  And such an act, without a doubt, communicates an image about the actor that is despicable, abhorrent and monstrous.   And unfortunately for Mr. Davis, that has been the perception that he has had to struggle against for years, knowing that it is unjustified.

93.   There is no question that Mr. Davis' string of arrests have played a catalytic role in virtually every scenario and instance where he has been considered for one benefit or another, including at his sentencing when he was enhanced for possessing a gun at the time of his arrest on December 13, 1988 even though no gun was ever discovered, (JA. 69), and even though, in spite of all his arrests and many run-ins with the police, he was never once found to be in possession of a gun.  Nevertheless, because of Mr. Davis' arrests, many of which never made it to court, he has been deemed an incorrigible and veritable malefactor by those in government bent on ensuring that he either die in prison or permanently expelled from American society.  Interestingly, Duane Knight, who also testified against Mr. Davis on behalf of the government and who was released on bond and ultimately served less than five years in prison, admitted during the trial to indiscriminately firing a flurry of gun shots into a house where children were. (JA. 115).  Yet this reprehensible act of violence did not prevent Duane Knight from being treated favorably by the same institution that to this day continues to regard Mr. Davis as a threat to society. Id.

94.   What was also kept away from the jury during Mr. Davis' trial were the murders committed by the cooperating witnesses who testified against Mr. Davis in hopes of receiving reduced prison sentences and other benefits that were extended to family members who would have otherwise been prosecuted. (JA. 110).  And to this day no one (except for those in government) knows why the Department of Justice continues to expend such an enormous amount of effort and resource in ensuring Mr. Davis' continued incarceration and permanent exclusion from the

American society notwithstanding Mr. Davis' pre-arrest efforts as a young man determined to forge a positive path for himself by embracing values such as hard work and responsibility that many of us today embrace in our own everyday lives as positive and productive members of our communities.

95.   Mr. Davis' fateful entanglement in the drug conspiracy for which he was convicted began when he inadvertently walked into a surveillance of some of the conspiracy's members and ended up becoming the focus of the surveillance.   One day during the summer of 1990 in Dallas, Mr. Davis was riding the motorcycle that he had recently purchased and recognized people that he knew standing next to their vehicles in a motel parking lot.   Wanting to show off the motorcycle, Mr. Davis turned and entered the parking lot.   He knew many of the people standing around that day, including Duane Knight who he allowed to ride the motorcycle around the parking lot.   Some of the people present that day were later charged in the conspiracy; others were not.   Mr. Davis hang around for approximately 20 to 25 minutes, then rode off.   The surveillance footage taken that day, enlarged and enhanced during the trial, became the lynchpin in the government's narrative and ultimately solidified Mr. Davis' participation in the conspiracy in the minds of the jury.

96.   Equally damaging was Mr. Davis' arrest in a house on Wendelkin Street that is located across from an apartment building out of which the conspiracy sold crack cocaine.   Mr. Davis' presence in that house was part of his surreptitious tactic of taking away from the building's operators without getting caught, (JA. 113), which ultimately backfired and led to him getting shot at—repeatedly.

97.   The house in which Mr. Davis was arrested was occupied by a woman who was a drug addict and who also had two young daughters living with her, both of whom were around six to eight years old.   Mr. Davis was only able to gain access to the house through promises of financing

the woman's drug habit with the agreement that in return the monthly subsidy that she received through state-sponsored programs for her daughters would be fully allocated towards the girls' well-being.  To ensure that the woman lived up to her end of the agreement, the time that Mr. Davis spent inside the house casing the building across the street was also spent engaging in conversation with the two young girls to assess whether they were properly being cared for.

98.    Mr. Davis had no business in Dallas.  That much is evident by the steps and the efforts he made to do something productive with his life *after* leaving Dallas.  But he will never say that it was a mistake for him to go to Dallas simply because that would also mean that his son, Gerald, was a mistake.  Nevertheless, Mr. Davis' character and attitude alone have always, and continues to, illuminate the goodness that is readily seen in him—a quality that became the driving force behind him sponsoring two young children in Ecuador while he was in Dallas and putting forth the effort in keeping up with their growth. (These anecdotal occurrences are recorded in trial documents).

99.    One may argue that it is Mr. Davis' fault for putting himself in the predicament that he is today by affiliating himself with a less than scrupulous crowd who exhibited patterns of affinity for lawlessness.  But then the Supreme Court would be wrong for explaining that "children [] lack of maturity and [] underdeveloped sense of responsibility[] lead to recklessness, impulsivity, and heedless risk-taking," and for further explaining that children "vulnerab[ility] to negative influence and outside pressures, including from their family and peers," and their "lack [of] ability to extricate themselves from horrific, crime-producing settings … [makes them] less deserving of the most severe punishments … because [their] character is not as well formed as an adult's, [their] traits are less fixed[,] and [their] actions are less likely to be evidence of irretrievable depravity." Miller v. Alabama, 182 LEd.2d 251 (2012), *quoting* Roper v. Simmons, 543 U.S. 551, 569 (2005) & Graham v. Florida, 560 U.S. 495 (2010).

31

100. Hannah Arendt, a German-born political philosopher, once argued that expressions of injustice within the institutional setting typically derives from a bureaucratic mindset in which rules and routines overcome the capacity to reflect on one's actions.  Perhaps there is some truth to that argument, especially when considering that lines have to be drawn in the confrontation between criminals and those who have been entrusted with the responsibility to defend against crime.  But even though our system of justice is an inherently good system, it is not infallible.  Therefore, while the responsibility to protect society will always remain paramount, it oftentimes becomes convenient from a bureaucratic standpoint for those in government to replace personal perceptions, attitudes and opinions with the rules and routines spawned by the bureaucratic process in order to get the job done.  But if the system has made a mistake and the mistake is either self-evident or proven, then it becomes incumbent upon the system not to hesitate to correct that mistake. Confidence in the system is not only formed whenever the system works, but it also arises from what the system does when it fails.

101. Unfortunately, in circumstances like Mr. Davis', once someone develops a negative perception or opinion about a person or thing, it usually becomes difficult for that person or thing to be seen in any other light but a negative one, even when there is no justification for the negativity.

102. There is no factual basis or moral reason that the Defendants, or anyone else for that matter, could point to in the convoluted events of Mr. Davis' criminal case and the events of his personal background to justify the oppressive governmental conduct that he has had to endure, and continues to endure, based solely on a time in his life when he was a kid.  Nevertheless, the Defendants in this case, well aware of the circumstances described here, have not only maintained the effort of continuing to deprive Mr. Davis of his liberty, but have taken steps to ensure that Mr. Davis is permanently removed from the country by inserting allegations in the NTA issued against

him that are materially false, and by relying on events underlying his federal drug conviction that never occurred. And there has been nothing that Mr. Davis has been able to do about it despite his many attempts in Immigration Court at challenging the allegations' veracity. This is the unbearable pain and suffering that Mr. Davis has had to endure while being told repeatedly that those who have sworn an oath to protect and preserve the liberties, values and the preservation of life and family upon which this republic was founded are also there to ensure that his claim to those liberties and values is protected.

103. Despite the fact that Mr. Davis was sent to federal prison for the duration of his life back in 1993 based on events and actions that never occurred, he continued to cling the idea that his circumstance will one day improve, and to his belief of putting family first. While in prison, Mr. Davis dedicated himself to doing whatever he could to ensure that his son, Gerald, who lived in an environment that breeds failure, avoid the same fate that he himself has experienced. He worked tirelessly in the Federal Prison Industries (JA. 140-147) to be able to help support both Gerald and Brandon as best he could. And when Gerald's experience at home became difficult, Mr. Davis convinced the Hershey Boarding School founded by the philanthropist, Milton Hershey, to enroll Gerald, meanwhile doing his best to convince Gerald's mother of the wisdom of allowing Gerald to relocate to the school's compound. To Mr. Davis' surprise, his efforts paid off as the school expressed interest in enrolling Gerald. (At the time, Mr. Davis, through a letter-writing campaign, succeeded in leapfrogging a two-year enrollment waiting list). But unfortunately, Gerald's mother foiled all the efforts made by Mr. Davis by reneging on her word to send Gerald away.

104. Undeterred in his dedication to remove Gerald from the unhealthy environment in which he lived, Mr. Davis later succeeded in convincing Gerald's mother to cede custody over Gerald to his mother in New York, hoping that the change in environment would provide his son with a better

33

chance at a productive future. (JA. 157).  That enormous achievement, however, proved short-lived as Gerald became homesick after living in New York for more than a year and insisted on returning home.

105.  Still undeterred, Mr. Davis continued parenting from prison via telephone and correspondences, ultimately relying on those limited mediums to communicate with Gerald's high school football coach when Gerald became a sensation in high school football and caught the attention of a number of major college football programs.  He also communicated with a probation officer when Gerald first got into trouble with the law, and communicated with whoever he was able to convince to help him salvage his son's future.  But in the end it all proved futile as Gerald squandered opportunities that were presented to him and was sent to prison for selling drugs, killing his dream (and Mr. Davis') of playing professional football in the process.

106.  Brandon, on the other hand, who was raised by a mother who is a school teacher and has experienced a less difficult upbringing, is currently attending college but has developed quite a bit of anger towards Mr. Davis for being absent his entire existence on the planet.  Still Mr. Davis continues to cling to hope that one day he will be able to share some semblance of a meaningful life with his sons and his two adopted daughters despite the overwhelming cloud of uncertainty that he is faced with.

107.  What is unique about the circumstances of Mr. Davis' case is that they illuminate an under-explored area of concern that has quietly but resolutely contributed to the problem plaguing our criminal justice system and, as it turns out, how the deportation process is currently being executed—an area of concern that is driven by the actions of those entrusted with the responsibility of defending our civil rights and liberties and their unique ability to mask whatever feelings of indifference, intolerance, prejudice and callousness that they harbor beneath their role as custodians

of our rights and liberties.  It is markedly difficult, and at times seemingly impossible, to mount an argument of governmental abuse and impropriety when the injury complained about is intertwined with allegations of criminality that are invariably used to inveigle our attention away from the complained about abuse and constitutional violations.  That, coupled with the fact that a wary public that has consistently shown support towards poorly explained efforts to eliminate crime and those identified as its purveyors, have inevitably reverted back to the unique ability of those given the responsibility to execute our laws to do so in a manner that is consistent with their own personal views as oppose to standing on the principles of justice and truth that the Constitution requires.

108.  That notwithstanding, it is tempting for those on the outside looking in to infer that this case is about one individual who received a raw deal.  But in truth, this case actually represents the hopelessness that confronts children of color today struggling to belong in a society that has yet to fully accept that they belong or that they arrived on this rock possessing something valuable to contribute to the progression of life.   And even though President Obama has courageously put together a Clemency Initiative project that, together with the recent changes that have been made to the Federal Sentencing Guidelines by the U.S. Sentencing Commission, were designed to counter those ideas of hopelessness, uncertainty, suspicion, and distrust that continues to confront young black men while taking the first step towards ameliorating the problems of unfair justice and the devaluation of life that we have witnessed unfold within our criminal justice system with alarming frequency over the past two decades, the reality is that the challenges and opposition that Mr. Davis continues to face in spite of the President's and the Sentencing Commission's efforts are indicative of the amount of work that still needs to be done before any real progress will begin to manifest. Unfortunately, the challenges that Mr. Davis continues to face in his efforts to reclaim his life despite the struggles that he has already endured have greatly undermined the confidence that was

supposed to have been drawn from the efforts made by the President and the Sentencing Commission to begin the difficult journey of reforming a broken justice system.

109.  This is not the first time that the circumstances of Mr. Davis' case has been held up for scrutiny.  But each time an examination is made, the outcome has been one of indifference and resistance rather than expressions of humanity and the tenor of hope that inspires confidence and belief in a system of government that is fair, has respect for life and human dignity, and guarantees equal justice under the law.  For Mr. Davis who has been forced to endure a slow and painful institutional death, the American value of preserving life, freedom, dignity, and justice for all has sadly devolved into hallow expressions of a belief that is out of reach to those incapable of attracting support through convenience, while evoking a sense of abandonment that is known only to those at the bottom of the pile.  That the President has expressed that America is a nation of second chances means nothing if the rest of us do not believe that.

110.  Despite the ongoing acts of government abuse that Mr. Davis continues to endure based on the resuscitating idea that he is an incorrigible malefactor deserving of the fate that has been ascribed to him over the past two decades, he nevertheless has been able to garner the support of accomplished and reputable members of the community who have gladly put their reputation on the line to support him, (JA. 121-137)—folks who believe that he has more to offer than simply being relegated to the dark contours of a prison cell forced to watch his life waste away with time under the guise of protecting society from his future criminal conduct as opposed to him being able to divert his creativity towards developing his company, Sivad Development, (JA. 158), or some other endeavor, into something useful and productive.  These wonderful people have nothing to gain by helping Mr. Davis other than simply living out the creed of what our nation is supposed to represent.  And none have bought into the notion that Mr. Davis deserved the fate that he has endured, or that

he deserves to be banished from the only country that he knows and from his family. Without question, this is a step in the right direction as the number of support continues to grow. And as with all cracks in a dam, in time a gorge will begin to form and answers will begin to be demanded.

### PART E: <u>Analysis of DHS' Conduct</u>

111. Since Mr. Davis is a lawful permanent resident with longstanding ties to this country, under the Immigration and Nationality Act (INA), DHS "bears the burden of [proving that he is deportable], which it must [do] by adducing clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true." <u>Francis v. Gonzales</u>, 442 F.3d 131, 138 (2nd Cir. 2006).

112. It is true that Mr. Davis has a felony drug conviction for which he was sentenced to life in federal prison. But as the above discussion of facts soundly shows, Mr. Davis' drug conviction has been (and continues to be) based on fabricated and unreliable evidence, and therefore can no longer serve as basis to further deprive him of his rights and liberty. Yet despite knowing this, DHS has continued in its efforts to permanently remove Mr. Davis from the country and from his family and friends based on an unjust and unreliable drug conviction.

113. To further compound the injustice, Defendant Gingerich deliberately added an allegation in the NTA that he issued against Mr. Davis which states that Mr. Davis previously served four (4) years in prison *prior to* his current incarceration, (JA. 155), and has relied on this allegation to justify charging Mr. Davis with moral turpitude under the INA. (JA. 156).

114. Under the INA as it currently exist, two or more convictions for which a sentence of one year or more could have been imposed renders the alien removable on the ground of moral turpitude. Under pre-1996 immigration law, a sentence of one year or more *had to actually have been served* in order to trigger the moral turpitude classification under the INA. In Mr. Davis' case,

he has two convictions; his current drug conviction, and a previous conviction for theft. He has obviously served a sentence of more than a year on his drug conviction. But no prison time was ever imposed on the theft conviction despite Defendant Gingerich's allegation that there was. Defendant Gingerich's allegation thus triggers the moral turpitude classification under the INA because Mr. Davis has now been deemed to have served a prison sentence of more than a year on his two prior convictions.

115. As stated, Mr. Davis has repeatedly challenged the allegations outlined in the NTA in Immigration Court and twice before the Board of Immigration Appeals (BIA) to no avail as the allegations continue to serve as basis for his impending deportation. In addition, Mr. Davis has also challenged DHS's reliance on immigration statutes enacted *after* 1996 (well after his conviction in 1993) to effectuate his removal, arguing that application of those statutes to his removal proceedings constitutes an impermissible retroactive effect as explained by the Third Circuit in Atkinson v. Attorney General, 479 F.3d 222 (3rd Cir. 2007). The post-1996 statutes upon which DHS is relying to effectuate Mr. Davis' removal were enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, enacted April 24, 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546, enacted on September 30, 1996 (collectively "the 1996 Amendments"). The 1996 Amendments amended the INA (66 Stat. 163, 8 U.S.C. § 1101 et seq.) by essentially stripping the Attorney General of his previously held broad discretion to cancel, suspend, waive or simply terminate deportation proceedings and deportation orders for deportable aliens who met certain residence requirements.

116. During one of Mr. Davis' several removal proceedings, the presiding Immigration Judge conceded that the 1996 Amendments do not apply in his case. Nevertheless, no changes were made,

and Mr. Davis continues to face deportation based on allegations that never occurred, and based on immigration statutes that have been deemed inapplicable to his removal process.

117. As stated, Mr. Davis has *never* served any prison time prior to his present incarceration. And even though Mr. Davis has *repeatedly* challenged the allegation as factually untrue, the allegation continues to be used against him. Had Defendant Gingerich simply made the allegation without relying on it as a predicate for Mr. Davis' removal, then an argument could have been made that the allegation was a product of inadvertence or simply an erratum. But instead, Defendant Gingerich *deliberately* relied on the allegation as basis for charging Mr. Davis with moral turpitude in the NTA, (JA. 156), and maintained the allegation each time that Mr. Davis challenged it in Immigration Court and before the BIA. Cf. 8 U.S.C. § 1229a(c)(3)(A) ("No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.").

118. The Supreme Court, in deciding Chessman v. Teets, 354 U.S. 156, 1 LEd.2d 1253 (1948), a case that involves the deprivation of an accused's due process right based on a State procedure that was fundamentally unfair which led to a loss of liberty, held that "consistent[] with procedural due process, California's affirmance of [the] petitioner's conviction upon a seriously disputed record, whose accuracy petitioner has had no voice in determining, cannot be allowed to stand." 1 LEd.2d at 1260. In so holding, the Court explained that "[w]e must be deaf to all suggestions that a valid appeal to the Constitution, even by a guilty man, comes too late, because courts, including this Court, were not earlier able to enforce what the Constitution demands." Id. The Court tempered this explanation to mean that "[t]he proponent before [us] is not the petitioner but the Constitution of the United States." Id; cf. Payne v. Arkansas, 356 U.S. 560, 2 LEd.2d 975 (1958) (observing that due process, guaranteed by the Fourteenth Amendment, is denied accused

where he is deprived of that fundamental fairness which is essential to the very concept of justice).

119.  Here, if the Defendants cannot show that Mr. Davis has either overlooked material evidence in the fourteen volumes of trial transcript that have heretofore been relied upon to justify his conviction for being a member of the "Allen Organization" drug conspiracy and his ensuing 23½ years of confinement, then as a matter of protecting the integrity of the United States Constitution and its preservation of life and liberty and the fundamental precept of justice and fairness that are "consistent[] with procedural due process," 1 LEd.2d at 1260, Mr. Davis' drug conspiracy conviction can no longer serve as a basis to further deprive him of his liberty and his ability to aspire towards those "personal rights essential to the orderly pursuit of happiness by free men." Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817 (1967).

120.  Because Mr. Davis' drug conspiracy conviction, in the eyes of Supreme Court, offends the precept of fundamental fairness that the Constitution's due process clause guarantees and therefore "cannot stand," Niemotko v. Maryland, 340 U.S. 268, 271, 95 Led.2d 267 (1951), and because Mr. Davis' drug conviction, in the words of United States Deputy Attorney General James M. Cole, "erode people's confidence in our criminal justice system," (Remarks at the N.Y. State Bar Association Annual Meeting (Jan. 30, 2014)), then it must follow that his conviction can no longer serve as a legally sound and reliable basis for further legal penalty and/or exclusion from benefits provided by federal statutes, regulations, and the United States Constitution.

121.  Finally, as discussed above, the United States Supreme Court, in Judulang, has outlined the standard that DHS is required to employ in its efforts to deport lawful permanent residents like Mr. Davis who arrived in the country as a child.  However, in Mr. Davis' case DHS has elected to pursue an arbitrary method of deporting him by relying on false information and unreliable evidence, and by relying on a standard that has been determined to be inapplicable to Mr. Davis'

removal process under Supreme Court law.  And up until this point, there has been nothing that Mr. Davis has been able to do about it.  This standard of removal under Judulang matters because Mr. Davis also has a money laundering conviction that he has not contested which is part of his drug conspiracy indictment, and DHS has also moved to deport him on that conviction. (JA. 155).

122.  The overarching exercise of government authority discussed here constitutes an encroachment upon Mr. Davis' rights and liberties guaranteed by the Constitution.  And as it stands, Mr. Davis continues to struggle against the abusive, unlawful and unjustifiable governmental attempts to permanently destroy his life—or whatever life he has remaining.

## VII. LEGAL THEORY

123.  Title VI of the Civil Rights Act provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." (42 U.S.C. § 2000d).

124.  Title 28 C.F.R. § 0.35 provides that the Pardon Attorney "shall have charge of the receipt, investigation, and disposition of applications [for executive clemency]." Id.

125.  Title 28 C.F.R. § 0.36 provides that the Pardon Attorney must submit her recommendation on clemency applications to the Attorney General.

126.  Title 28 C.F.R. § 1.7(f) provides that the Attorney General must advice the President as to "whether, in his judgment, the request for clemency [merits] favorable action by the President."

127.  The Constitution's Equal Protection Clause proscribes selective treatment and selective enforcement of and against persons who are similarly situated, and against any person based on his or her national origin.

128.  The Constitution's First, Fifth and Eighth Amendments guarantee freedom from

oppressive government conduct and the right to the pursuit of happiness without unjustifiable and unlawful government interference.

129.   The Constitution's Fifth Amendment guarantees due process under the law and the right to be treated equally and fairly under the law as those similarly situated.

130.   Title 5 U.S.C. § 706 et seq of the Administrative Procedure Act provides a cause of action against an agency's action that is arbitrary and capricious and an abuse of discretion.

131.   Title 28 C.F.R. § 42.104 prohibits recipients of Federal funds from discriminating against any person on the grounds of race, color, or national origin.

## VIII.  **PLAINTIFF'S INJURY**

132.   The goal of the President's Clemency Initiative is to specifically address injustices like what occurred in Mr. Davis' case.  This goal was validated and put into action by members of the President's administration such as Valerie Jarrett, the White House's senior adviser, who expressed in the Washington Post editorial that the President "wants to make sure [that those convicted and sentenced like Mr. Davis] don't get unfairly stuck in the criminal justice system because they've made mistakes early in their lives, without the ability to ever have a second chance," and by Deputy Attorney General, James M. Cole, who publicly announced the President's Clemency Initiative by explaining that, (a) "[f]or our criminal justice system to be effective it needs to not only be fair, but it also must be perceived as being fair"; (b) "[t]hese older, stringent punishments that are out of line with sentences imposed under today's laws erode people's confidence in our criminal justice system"; (c) the expectation is that the clemency initiative "will go far to promote the most fundamental of American ideals—equal justice under law"; and (d) the initiative was not limited to crack offenders, but to "worthy candidates" who meet the six specific criteria outlined above. (*See*, para. 34, *supra*).

133. Notwithstanding the President's stated goals for executing his Clemency Initiative, and notwithstanding the fact that the circumstances that resulted in Mr. Davis spending decades of his life in a federal prison fall squarely within the President's stated goals and fully reflect the narrative of "fairness" and "public confidence" that members of the President's administration have espoused as part of the Clemency Initiative effort, Defendant Leff, fully aware of the circumstances of Mr. Davis' case, decided against favorably recommending Mr. Davis for clemency.

134. Defendant Leff, in her individual capacity and under color of federal law, violated Mr. Davis' First, Fifth and Eight Amendment rights by abusing her discretion, and by arbitrarily and capriciously executing her duties as Pardon Attorney.  This action has caused Mr. Davis significant pain and suffering.

135. Defendant Leff, in her individual capacity and under color of law, acted arbitrarily and capriciously is deciding against favorably recommending Mr. Davis for clemency, causing Mr. Davis significant pain and suffering.

136. Defendant Leff, in her individual capacity and under color of federal law, abused her discretion in deciding against favorably recommending Mr. Davis for clemency, causing Plaintiff significant pain and suffering.

137. Defendant Leff, in her individual capacity and under color of federal law, acted arbitrarily and capriciously, and abused her discretion in deciding against favorably recommending Mr. Davis for clemency in violation of the Administrative Procedure Act, causing Mr. Davis significant pain and suffering.

138. Defendant Leff, in her individual capacity and under color of federal law, deprived Mr. Davis access to a benefit specifically created to address his situation based on his national origin, causing Mr. Davis significant pain and suffering.

139. Defendant Leff, in her individual capacity and under color of federal law, engaged in a process of selective treatment and selective enforcement in executing the President's Clemency Initiative, which unfairly and unlawfully affected Mr. Davis' enjoyment of a fundamental liberty and his pursuit of happiness.

140. Defendant Johnson, in his individual capacity and under color of federal law, created and maintained a policy and practice that have resulted in Mr. Davis being subjected to (and continues to be subjected to) an unlawful exercise of governmental power, thereby causing Mr. Davis significant pain and suffering.

141. Defendant Johnson, in his individual capacity and under color of federal law, created and maintained a policy and practice that have subjected (and continues to subject) Mr. Davis to abuse of governmental power, denial of his liberty, and denial of his right to due process, and such policy and practice have caused Mr. Davis significant pain and suffering.

142. Defendant Johnson, in his individual capacity and under color of federal law, created and maintained a policy and practice that have subjected (and continues to subject) Mr. Davis to arbitrary, capricious, and abusive governmental power in violation of the Administrative Procedure, and such policy and practice have caused Mr. Davis significant pain and suffering.

143. Defendant Johnson, in his individual capacity and under color of federal law, has implemented deficient policies and practices and has been deliberately indifferent to the risk that such policies and practices will lead to the deprivation of Mr. Davis' constitutional rights. This violation has caused Mr. Davis significant pain and suffering.

144. Defendant Johnson, in his individual capacity and under color of federal law, and in creating and maintaining a policy and practice that have subjected Mr. Davis to an abuse of governmental power and arbitrary and capricious governmental conduct, has failed to supervise his

subordinates.  Defendant Johnson's failure in this respect has caused Mr. Davis significant pain and suffering.

145.  Defendant Gingerich, in his individual capacity and under color of federal law, violated Mr. Davis' First, Fifth and Eighth Amendment rights by unlawfully depriving Mr. Davis of the pursuit of happiness, by abusing his discretion, by subjecting Mr. Davis to cruel and unusual punishment, and by arbitrarily and capriciously executing his duties as Senior Deputy Deportation Officer.  This violation caused Mr. Davis significant pain and suffering by depriving him of his liberty.

146.  Defendant Gingerich, in his individual capacity and under color of federal law, acted arbitrarily and capriciously in deciding to move to remove Mr. Davis from the United States based on allegations that did not occur in violation of Mr. Davis' due process right and his right to be free of unlawful and abusive governmental conduct.  This violation caused Mr. Davis significant pain and suffering by depriving him of his liberty.

147.  Defendant Gingerich, in his individual capacity and under color of federal law, acted arbitrarily and capriciously in moving to remove Mr. Davis from the United States in a manner that contravene with the standard of removal established by the United States Supreme Court in Judulang v. Holder, *supra*, in violation of Mr. Davis' due process right and his right to be free from arbitrary, unlawful and abusive governmental conduct.  This violation caused Mr. Davis significant pain and suffering by depriving him of his liberty.

148.  Defendant Gingerich, in his individual capacity and under color of federal law, has arbitrarily and capriciously denied Mr. Davis the opportunity to have his removal proceedings conducted under the standard of removal established by the Supreme Court in Judulang v. Holder, *supra*, which is based on a fair and just assessment of whether Mr. Davis should be removed from

the United States or be allowed to stay.  In light of Mr. Davis' history as discussed above, under Judulang, DHS will not be able to establish the he is unfit to remain in the country.  Therefore, based on the Supreme Court's explanation in Judulang that as a lawful permanent resident with longstanding ties to this country, Mr. Davis "has [a] *right* to remain here," id 181 LEd.2d at 464 (emphasis added), and that DHS's efforts to deport him must take into account his "fitness to reside in this country" and "must be tied [] to the purposes of the immigration laws or the appropriate operation of the immigration system," Mr. Davis is due the process of having his "fitness" to remain in the country appropriately and fairly determined before DHS may lawfully deport him.  This violation caused Mr. Davis significant pain and suffering by depriving him of his liberty.

149.  Defendant Gingerich, in his individual capacity and under color of federal law, engaged in a process of selective treatment and selective enforcement in executing the immigration laws, which unfairly and unlawfully affected Mr. Davis' enjoyment of a fundamental liberty, and has resulted in a loss of liberty that he would have otherwise enjoyed.  This violation caused Mr. Davis significant pain and suffering by depriving him of his liberty.

150.  The unlawful conduct of the Defendants described herein have violated Mr. Davis' constitutional, civil, and statutory rights, including his right to the pursuit of happiness; his right not to be subjected to abusive and unlawful governmental powers; his right to equal protection under the law; and his right to equal access to rights and amenities guaranteed by the Constitution of the United States and federal law.  As a proximate result of Defendants' unconstitutional acts, omissions, policies and practices, Mr. Davis is suffering and will continue to suffer an unconstitutional deprivation of his guaranteed rights and liberty.

## IX. PLAINTIFF'S CLAIM FOR RELIEF

For all the foregoing reasons, Mr. Davis seeks the following relief:

i.   Mr. Davis seeks declaratory and injunctive relief to eliminate and remedy Defendant Johnson's unlawful application of immigration regulations, policies, practices, acts, and omissions that are depriving him of his liberty and access to the enjoyment of his life;

ii.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Johnson's rationale, bases, policies, practices, acts, and omissions described herein for moving to deport him are unlawful and exceeds Defendant Johnson's constitutional and statutory authority in violation of 5 U.S.C. § 706(2)(A)-(D);

iii.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Johnson's rationale, bases, policies, practices, acts, and omissions described herein for moving to deport him are unlawful and violate his constitutional rights as explained herein;

iv.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Johnson's rationale, bases, policies, practices, acts, and omissions described herein for moving to deport him are unlawful and exceeds Defendant Johnson's constitutional and statutory authority in violation of the Constitution's First, Fifth and Eighth Amendments;

v.   Mr. Davis requests that the Court permanently enjoin Defendant Johnson, his subordinates, agents, employees, and all others acting in concert with them from subjecting him to the statutory and constitutional violations and unconstitutional interpretation and application of regulations, policies, acts, and omissions described herein; and to further enjoin Defendant Johnson, his subordinates, agents, employees, and all others acting in concert with them from engaging in any retaliatory tactics, acts or omissions due to his exercising his constitutional right to redress;

vi.   Mr. Davis seeks declaratory and injunctive relief to eliminate and remedy Defendant Gingerich's unlawful application of immigration laws, regulations, policies, practices, acts, and omissions that are depriving him of his liberty and access to the enjoyment of his life;

vii.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Gingerich's rationale, bases, policies, practices, acts, and omissions described herein for moving to deport him are unlawful and exceeds Defendant Gingerich's constitutional and statutory authority in violation of 5 U.S.C. § 706(2)(A)-(D);

viii.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Gingerich's rationale, bases, policies, practices, acts, and omissions described herein for moving to deport him are unlawful and exceeds Defendant Gingerich's constitutional and statutory authority in violation of the Constitution's First, Fifth and Eighth Amendments;

ix.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Gingerich's rationale, bases, policies, practices, acts, and omissions described herein for moving to deport him are unlawful and violate his constitutional rights as explained herein;

x.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Leff's rationale, bases, policies, practices, acts, and omissions described herein for refusing to favorably recommend Mr. Davis for clemency based on his national origin are unlawful and exceeds Defendant Leff's constitutional and statutory authority in violation of 42 U.S.C. § 4000d;

xi.   Mr. Davis seeks the issuance of a judgment declaring that Defendant Leff's rationale, bases, policies, practices, acts, and omissions described herein for refusing to favorably recommend

him for clemency are unlawful and exceeds Defendant Leff's constitutional and statutory authority in violation of 5 U.S.C. §§ 706 (2)(A)-(D);

xii. Plaintiff seeks injunctive relief sufficient to rectify those statutory and constitutional violations described herein;

xiii. Alternatively, Mr. Davis requests that the Court issue a writ of mandamus compelling Defendant Leff to exercise her authority in recommending him for clemency in the manner consistent with the requirements and objectives set forth in the President's Clemency Initiative, and to ensure that provisions are made to immediately allow his application for clemency to be properly, adequately, and accurately evaluated and consider by the President;

xiv. Mr. Davis requests that the Court issue a writ of mandamus compelling Defendant Johnson to exercise his authority in ensuring that he is afforded a fair, proper, and adequate deportation proceeding that is consistent with his due process right, Supreme Court law, and the Constitution's precept of justice and fairness;

xv. The Defendants, as a matter of law, have a duty to exercise their authority in the manner described herein;

xvi. Lastly, Mr. Davis respectfully requests that the Court grant such other relief as the Court deems just and proper.


Respectfully submitted,

Dated: February 24 , 2016.

Brian A. Davis, (Pro Se Plaintiff)
Federal Register No. 40427-053
M.V.C.C.
555 Geo Drive
Philipsburg, PA 16866